IN RE PETITION OF DOWNER HOME: STATE, Appellant, v. DOWNER HOME, Respondent.

*No. 493. Argued February 5, 1975.—Decided March 4, 1975.*
(Also reported in 226 N. W. 2d 444.)

56

For the appellant the cause was argued by *James P. Altman,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the respondent there was a brief by *Whyte, Hirschboeck, Minahan, Harding & Harland, S. C.,* attorneys, and *Richard C. Ninneman* and *Edward B. Mueller* of counsel, all of Milwaukee, and oral argument by *Mr. Ninneman.*

ROBERT W. HANSEN, J. Challenged on this appeal is the permission granted by the Milwaukee county court to the trustee of this trust to use trust income to support a series of seminars for clergymen. Involved in such challenge are the will establishing the trust and three county court orders relating to the trust, in sequence of time being:

(1) *The 1885 will* devising real estate and establishing a trust fund for maintaining a home "for aged clergymen and their wives, and as a temporary home where invalids may rest and recuperate."

(2) *The 1965 order* of the Milwaukee county court granting petition of the trustee to sell the real estate, add the proceeds of sale to the trust fund, with the income to be used to pay ". . . for living expenses in private or public facilities for aged clergymen and their wives and invalids. . . ."

(3) *The 1973 order* of the Milwaukee county court (dated September 6, 1973) granting petition of trustee to amend the statement of purpose in its articles of incorporation to state its purpose to be ". . . to promote the welfare of clergymen and their wives, particularly those of advanced age, and to help and assist in providing for the rest and recuperation of invalids. . . ."

(4) *The 1973 order* of the Milwaukee county court (dated September 14, 1973) granting petition of the trustee to apply the income of the trust ". . . for the purpose of providing funds to enable Carroll College to hold certain seminars . . . to provide an opportunity for the continuing education of Presbyterian pastors and those of other denominations. . . ."

. From about 1888 to 1965, the income from the trust was used to maintain Downer Home as a place of residence for aged clergymen and their wives and as a temporary home for invalids. From 1965 on, income from the trust has been used to provide places or facilities as residence for aged clergymen and their wives, and for invalids to rest and recuperate.

In its 1973 petition, seeking court approval to use the trust income for seminars for clergymen, the trustee stated its belief that: ". . . this program [the seminars project] is in keeping with the purpose of Downer Home . . . ." Instead, the trial court ruled: ". . . In

order for *cy pres* to apply, I don't believe that the intended use of the funds must be exactly as stated in the will, but the general intent evidenced by the will should be carried out." The state challenges both the applicability and application of the *cy pres* doctrine to the petition for permission to use trust income for the seminars project.

While both parties to this appeal debate only the applicability and application of *cy pres* to the 1973 order of the county court, the issues raised involve as well the legal effect and consequence of the 1965 order of the county court. That order was secured by the trustee with the consent of the state. After the seventy-five years of operating the Downer Home with trust income, petitioner reported that the home property had deteriorated and established that there was a diminished demand for its use and secured court permission to sell the Downer Home. So court permission to sell the Downer Home property was granted.

However, what was sought and secured went beyond permission to sell real estate. A limited permission to sell a deteriorated piece of property might well have been no more than a required first step in relocating the home for aged clergymen in a new building and new location. In addition, the petitioner sought, the state consented to, and the court ordered that the proceeds of the sale of the real estate be added to the permanent trust fund, and that the income be used to pay for living expenses in private or public facilities for aged clergymen, their wives and invalids. Thus, under the 1965 court decree, the trustee was no longer required to use trust fund income to maintain a particular home for aged clergymen, the Downer Home, but was permitted to use trust income to provide places or facilities as residences for aged clergymen and their wives, and for invalids to use to rest and recuperate.

When the trustee of the trust, with the consent of the state, secured the 1965 court order, the specific mandate of the will, that the trust income be used only for the maintenance of a Downer Home residence for aged clergymen, was abandoned. After 1965, with the property sold and the proceeds becoming part of the corpus of the trust, Downer Home was no more. That being the situation, the 1965 court order provided that the trustees were to use trust income in keeping with the general purpose the testatrix had in mind, *i.e.*, providing places to live for aged clergymen and their wives, and places of rest and recuperation for invalids. This was done, and could only be accomplished, by application of the doctrine of *cy pres*.[1] Instead of holding the trust fund terminated

[1] *See:* Sec. 701.10 (2), Stats., codifying the common-law doctrine of *cy pres* and providing: "(2) MODIFICATION AND TERMINATION. (a) If a purpose of a charitable trust is or becomes impractical, unlawful or impossible, the court may order the trust continued for one or more other charitable purposes designated by the settlor or, in the absence of such designation, order the property devoted to one or more other charitable purposes either by continuing the trust or by distributing the property to one or more established charitable entities. In determining the alternative plan for disposition of the property, the court shall take into account current and future community needs in the general field of charity within which the original charitable purpose falls, other charitable interest of the settlor, the amount of principal and income available under the trust and other relevant factors. . . ." *See also: Estate of Berry* (1966), 29 Wis. 2d 506, 515, 139 N. W. 2d 72, summarizing the *cy pres* doctrine to be: "'Very briefly stated, when a charitable purpose cannot be fulfilled according to its terms, equity will attempt to do the next-best similar charitable thing. This is the *cy pres* doctrine.'" (Quoting *Saletri v. Clark* (1961), 13 Wis. 2d 325, 329, 108 N. W. 2d 548.) *See also: In re Charitable Trust, Oshkosh Foundation* (1973), 61 Wis. 2d 432, 436, 437, 213 N. W. 2d 54, stating: ". . . *Cy pres* is the common-law doctrine, codified by statute in this state, that provides '". . . when a charitable purpose cannot be fulfilled according to its terms, equity will attempt to do the next-best similar charitable thing."'" (Citing *Estate of Berry, supra,* and quoting *Saletri v. Clark, supra.*)

by the closing down of Downer Home, the court was holding that the object of the testatrix was not limited or centered alone upon the designated home, but rather upon what this court has termed "a general scheme to promote a given *cause*," with the home named "a mere agency for administrative purposes," with the court not permitting the general purpose to fail because the particular agency designated ceased to exist.[2] It has been noted that where, as here, a particular charitable purpose is initially fulfilled, but subsequently fails, there is less hesitation to thus apply *cy pres*.[3]

We deal here and now with the consequences, not the validity, of the 1965 court order. However, it is clear

[2] *See: Estate of Briggs* (1926), 189 Wis. 524, 529, 208 N. W. 247, this court holding: "While it may be conceded that a bequest to a particularly denominated hospital might ordinarily be deemed lapsed where such hospital is in fact non-existent (which would also be true as to a given church or school under the same circumstances), nevertheless, if from all the surrounding facts and circumstances it can reasonably be gathered that the object of the testator was centered not in the aims of one hospital or one church or one school, but upon a general scheme to promote a given *cause*, then such named hospital, church or school may be deemed a mere agency for administrative purposes, and if the agency fails, a chancellor will not permit the purpose to fail, but will supply a new agency in the form of a trustee, to carry out the testator's intention. . . ." (Emphasis in original.)

[3] 4 Scott, *Trusts* (3d ed.), p. 3111, sec. 399.3, stating: ". . . [W]here at the time of the creation of the trust it is possible and practicable to carry out the specific directions of the testator, but in course of time conditions change so that it becomes impossible or impracticable to carry out these directions, the cy pres doctrine is almost invariably applied, and it is rare indeed that the trust is held to fail altogether. . . ." *See also:* Restatement, 2 *Trusts* 2d, p. 302, sec. 399, comment *i*, stating: ". . . If property is given in trust to be applied to a particular charitable purpose, and at the time when the property is given it is possible and practicable and legal to carry out the particular purpose, but subsequently owing to a change of circumstances it becomes impossible or impracticable or illegal to carry out the particular purpose, it is easier to find a more general charitable intention of the settlor than it is where the particular purpose fails at the outset. . . ."

that the court in 1965 applied the doctrine of *cy pres* to redefine the purpose of the trust and the authority of the trustee. So we are puzzled by the state now contending that *cy pres* is not applicable to this trust fund after sale of the Downer Home because, to quote its brief, ". . . the will designates contingent beneficiaries upon the failure of the Downer Home." The will provision as to an alternative disposition applied only if the Downer Home was not established within one year. This is not an "alternative disposition" under the statute [4] where the home was established within the one-year period prescribed. We find the provision for contingent beneficiaries contained in this will clearly not applicable to a court-authorized abandonment of Downer Home after seventy-five years of continuous operation. [5] The state could have sought termination of the trust in 1965 when the Downer Home was sold. It is not likely that it would have succeeded, [6] but, having consented to the sale of the

[4] Sec. 701.10 (2), Stats., as to alternative disposition, providing: ". . . The provisions of this subsection [as to modification of charitable trusts] do not apply insofar as the settlor expressly provides in the creating instrument for an alternative disposition if the original trust fails . . . ."

[5] This alternative disposition is, by express provision of the will, to be available or used, both as to the real estate devised and as to the residue of the estate and lapsed legacies placed in the trust, only if the Downer Home "shall not be established" or "[i]f the said elders [named trustees] of the said Church shall not . . . take all legal steps possible and necessary within a year after my decease to establish said home." That contingency did not arise, so the situation is entirely different from that in *Estate of Berry, supra,* footnote 1, holding that, where the will involved unambiguously gave a portion of the trust to two colleges, upon the contingency specified in the will becoming a reality, the gift over or alternative disposition provided for in the will was to be followed.

[6] *See:* Restatement, 2 *Trusts* 2d, p. 302, sec. 399, comment *i,* stating: ". . . The courts are therefore more ready to apply the doctrine of cy press where the particular purpose fails at some

real estate and modification of trust purposes in 1965, it certainly cannot now claim that *cy pres* was then inapplicable.

So the trustee came to the county court in 1973 with the authority to administer the trust limited, by the court order of 1965, to the use of income to provide for living expenses in public or private facilities for clergymen and their wives and for the rest and recuperation of invalids. The trustee sought court permission to use income from the trust to underwrite a series of seminars for clergymen in general at Carroll College. There were two bases, alternative each to the other, on which such court approval could be sought: (1) As a matter of reasonable interpretation establishing that the class of persons served and the nature of the benefits conferred by the proposed use of income came within the terms of the trust as defined by the 1965 order; or (2) the fulfillment of the purposes of the trust, as defined in the 1965 order, having become impracticable, the trustee, under *cy pres*, should be permitted to do the "next-best similar charitable thing" [7] by financing a series of religious seminars for clergymen at the college. The wording of the petition, including the statement that the proposed use of trust income ". . . is in keeping with the purpose of Downer Home," would indicate that the trustee traveled the first route. The trial court's reference to *cy pres*, and its holding that the proposed use need not be ". . .

time after the creation of the trust than they are where the particular purpose fails at the outset.

"As a matter of public policy it might well be held that in the case of a subsequent failure of the particular purpose the doctrine of cy pres should always be applied and that the property should never revert to the settlor or his estate. The longer the period between the creation of the charitable trust and the failure of the particular purpose, the more undesirable it is that the property should revert to the settlor's estate."

[7] *In re Charitable Trust, Oshkosh Foundation, supra,* footnote 1, at page 437.

exactly as stated in the will, but the general intent evidenced by the will should be carried out," indicates that the court considered the petition one for amending the trust under *cy pres*. In either event, the record and testimony offered do not support granting the petition.

Viewed as an application for court-approved use of trust income under the terms of the trust, the test is whether the proposed financing of the religious seminars comes within the dispositive provisions of the trust, as redefined in the 1965 order. The dispositive part of an instrument creating a private trust is that "in which the settlor describes the beneficiaries who are to obtain financial benefits, fixes the size of those benefits, and in many cases states the purposes of the trustor in providing for these benefits." [8] It is to be kept in mind that all that the 1965 order did was to strike the mandate of the trust that a particular Downer Home be established and maintained, and substitute as the purpose of the trust a more general aid and assistance to aged clergymen, their wives and invalids as "the next-best similar charitable thing." As to the class of beneficiaries who were to obtain financial benefits, from the trust, it left unchanged the trust provisions of the will. The class of persons to be benefited, under the will and under the 1965 order, is spelled out in both instruments to be "aged clergymen and their wives," and "invalids [to] rest and recuperate." The fund-subsidized seminar series at the college was to be for clergymen in general, regardless

[8] *Id.* at page 439, fn. 13, quoting Bogert, *Trusts and Trustees* (2d ed.), pp. 128, 129, sec. 561, stating: "Every instrument creating a private trust contains two parts, namely, (1) that in which the settlor describes the beneficiaries who are to obtain financial benefits, fixes the size of those benefits, and in many cases states the purposes of the trustor in providing for these benefits; and (2) the portion of the instrument in which the settlor provides for the methods by which the trustee is to employ the trust property in such a way as to secure for the cestuis the intended advantages . . . ."

of their age, with young and old alike permitted to participate. This is a broader class of persons benefited than that prescribed by the will or by the court order of 1965. Where a bequest to the city provided that it was to be used for the erection and maintenance of an old people's home " '. . . where elderly people may go and live and enjoy the comforts of life at reasonable rates and for reasonable compensation, . . .' " this court held that the trust fund ". . . cannot be used indiscriminately for the general maintenance of the City Home or inmates thereof who are not in the class described in the will as elderly people who go and live there for the purposes and under the conditions stated in the will. . . ." [9] We see no reasonable construction or interpretation of the terms of this trust that would permit use of trust income in a project of educational benefit to clergymen in general, and not primarily intended or resulting in providing living facilities for aged clergymen and their wives or for the rest and recuperation of invalids. The class of persons to be benefited by the religious seminars goes beyond the category of persons designated as beneficiaries under the trust.

Viewed as an application for the court to approve the underwriting of the cost of the seminars as the "next-best similar charitable thing," such *cy pres* approach would require a court finding, at common law and under

[9] *Fairbanks v. Appleton* (1946), 249 Wis. 476, 478, 484, 24 N. W. 2d 893, this court modifying a trial court order applying the trust fund to the maintenance of an existing home for the aged and others, stating: ". . . Consequently, in order to approximate as nearly as possible and practicable the testatrix's intended purpose, the judgment should provide that the use of the trust funds by the city shall be limited to its erection or maintenance, either separately or in conjunction with its present City Home, of such facilities, services, and conditions as are appropriate and essential to make and maintain some part thereof as a Home where elderly people may go and live for the purposes and under the conditions stated in the will. . . ."

the statute, that "complying with the trust's stated purpose has become *impossible, unlawful* or *impracticable.*" [10] The reference as to impossibility or impracticality is not to the maintaining of Downer Home, abandoned in 1965, but to the continual use of the trust income for the more general purpose of assisting retired clergymen, their wives and invalids, as provided in the 1965 order. There is no testimony here to support a finding that the trust income can no longer be used pursuant to and within the limits of the authority granted by the 1965 decree. There is testimony indicating that the trustee believes aiding the seminars would be a better use of the income than staying with the 1965 directive, but that is not the test. [11] Nor does the simultaneously sought amendment of the articles of incorporation of the trust corporation change the picture. As to the use of trust funds, the authority of the charitable corporation is limited by the terms of the document creating the trust, here as modified in the 1965 court order. [12] One cannot

[10] *In re Charitable Trust, Oshkosh Foundation, supra,* footnote 1, at page 437, stating of the recourses to *cy press:* ". . . At common law and under the statute, a finding is required that complying with the trust's stated purpose has become *impossible, unlawful* or *impracticable. . . .*" (Emphasis in original.)

[11] *Id.* at pages 437, 438, this court stating: ". . . But *cy pres* does not warrant a court substituting a different plan for that set forth in the trust solely because trustee or court, or both, believe the substituted plan to be a better plan. . . ."

[12] *See:* 4 Scott, *Trusts* (3d ed.), pp. 2992, 2993, sec. 385A, stating: ". . . Where property is given to trustees for charitable purposes, they cannot delegate the administration of the trust to an existing charitable corporation, unless authorized to do so by the terms of the trust or by order of the court.

"The question arises, however, whether the trustees may form a corporation to administer the trust. It has been held that they can properly do so, if this does not involve a departure from the purpose of the donor. . . . Where the trustees can properly form a charitable corporation to administer a trust created by a testator's will, the provisions of the charter or certificate of incorporation *must be such as are in accordance with the will. . . .*" (Emphasis supplied.)

change the provisions of a trust, certainly not its dispositive provisions, by changing the articles of incorporation of a charitable corporation formed to administer the terms of the trust and carry out the intent of the creator of the trust. That shortcut is not available. To accomplish such change of purpose or enlargement of the class of beneficiaries to be served by the trust, a petition to amend the trust is needed and a showing that it is no longer possible, lawful or practicable to carry out the present purposes of the trust, as prescribed by its settlor, is required. When the trustee applied to the court in 1965, it petitioned not only for permission to sell the real estate but also for court authority to put the proceeds of sale into the trust fund, with the income to be used to assist retired clergymen, their wives and invalids. When the court granted such petition, a *cy pres* modification of the trust had been sought and secured. True it is that the classes of persons to be benefited did not change, but the type of service or assistance to be given was altered. The basis for the *cy pres* modification of the trust purposes was not only a deterioration of Downer Home but also an established diminution in demand for the specific service provided. That was done in 1965, and the court then and there modified the trust purposes specified in the 1885 will. There is no basis in this record for a court finding in 1973 that it had become impossible to carry out the trust within the limits set by the 1965 court order. If this petition for approval can be construed as an action to amend or alter the trust by enlarging the class to be benefited, again resorting to the doctrine of *cy pres,* the endeavor fails because the required showing that the charitable purposes as pre-

As to the use of the income of this trust, it is the dispositive provisions in the trust document, here the will as modified by the 1965 court order, that govern, not the articles of incorporation or the bylaws of the charitable corporation that was formed to administer the trust.

scribed by the 1965 order cannot be fulfilled has not been made. We do not in any manner disparage the entire worthwhileness of denominational and interdenominational religious seminars for clergymen in general when we hold that it is not within the terms of this trust to use its income other than for living facilities for retired clergymen and their wives, and for facilities for the rest and recuperation of invalids. With no basis established for altering or amending the terms of the trust, and with the proposed use of trust income going beyond the limits of the class to be benefited by and under the trust, it follows that neither a reasonable interpretation of the terms of the trust, as modified in 1965, nor reliance on the doctrine of *cy pres,* here warrants the use of the income of this trust for the underwriting of the religious seminar series at Carroll College for clergymen in general. The court order approving such proposed use of such income of the trust must be reversed.

*By the Court.*—Order reversed.